Andrew Jake Mladinich, [1] Petitioner v. Commissioner. Mladinich v. Commissioner
Docket Nos. 3151-63 - 3153-63, 3409-63.
United States Tax Court
T.C. Memo 1969-185; 1969 Tax Ct. Memo LEXIS 111; 28 T.C.M. (CCH) 926; T.C.M. (RIA) 69185; September 15, 1969. Filed Floyd J. Logan, Gulfport, Miss., for the petitioners. Robert G. Faircloth, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined the following income tax deficiencies and additions to tax against the petitioners: Andrew Jake Mladinich, Docket No. 3151-63 Year
Deficiency
Addition to TaxSec. 6653(b),I.R.C. 1954
1955
$4,420.99
$2,210.50
1956
2,513.45
1,256.73
Andrew Jake Mladinich and June Mladinich, Docket No. 3152-63 Year
Deficiency
Addition to TaxSec. 6653(b),I.R.C. 1954
1957
$1,246.87
$ 623.44
1958
4,885.50
2,442.75
1959
3,192.97
1,596.49
Estate of Jake Mladinich, Sr., Deceased, Mary Mladinich, Administratrix, and Mary Mladinich, Docket No. 3153-63 Year
Deficiency
Addition to TaxSec. 6653(b)I.R.C. 1954
1955
$3,102.36
$1,551.18
1957
2,571.40
1,285.70
1958
5,304.88
2,652.44
1959
3,408.97
1,704.49
*113 John M. Mladinich and Virginia Mladinich, Docket No. 3409-63 Additions to Tax
Year
Deficiency
Sec. 6653(b)
Sec. 6654(a)
1955
$3,102.56
$1,551.28
1956
2,341.40
1,170.70
$21.73
1957
1,303.14
651.57
1958
5,083.38
2,541.69
1959
3,354.97
1,677.49 927 On March 24, 1969, the day before the trial began, respondent filed, with leave of the Court, amendments to his answers in Docket Nos. 3151-63 and 3409-63. The amendment to the answer in Docket No. 3151-63 alleges an increased deficiency and addition to tax for the year 1956 in the respective amounts of $1,745.36 and $872.68. The amendment to the answer in Docket No. 3409-63 alleges an increased deficiency and addition to tax for the year 1956 in the respective amounts of $1,343.11 and $671.56. Certain minor issues have been conceded by petitioners. The issues remaining for decision are: 1. Whether respondent properly used the net worth and nondeductible expenditures method of determining the correct taxable income of the Mladinich partnership for the years 1955 through 1959. 2. Whether the Mladinich partnership understated its taxable income for the years 1955 through 1959 resulting *114 in income tax deficiencies of the individual partners for those years. 3. Whether the doctrine of collateral estoppel applies so as to preclude petitioners from relitigating the issues decided in a refund suit by Jake Mladinich, Sr., and Mary Mladinich in the United States District Court for the Southern District of Mississippi relating to a claimed cash hoard of $35,000, the propriety of respondent's use of the net worth method, and the correctness of the net worth determinations. 4. Whether any part of the underpayment for each of the years 1955 through 1959 was due to fraud with intent to evade tax under section 6653(b). [2]
5. Whether the assessment of any deficiencies for the years 1955 and 1956 is barred by the statute of limitations. 6. Whether petitioners in Docket Nos. 3151-63, 3153-63 and 3409-63 are entitled to deductions in 1955 for a claimed partnership net operating loss carryover. Findings of Fact Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. All of the petitioners *115 were legal residents of Biloxi, Mississippi, when they filed their respective petitions in these cases. All of them filed their Federal income tax returns for the years 1955 through 1959 with the district director of internal revenue at Jackson, Mississippi. During the years 1955 through 1959 Jake Mladinich, Sr., and his two sons, Andrew Jake and John, were equal partners in businesses located on or near United States Highway 90, a short distance west of Biloxi, Mississippi. These three individuals will sometimes be referred to herein as the "partners." During 1951 the partners built and began operating a business known as the Fiesta Sand Bar, a bar and lounge which was located on the beach side of United States Highway 90 near Biloxi. The name of the business was changed in 1955 to Fiesta Lounge. In 1954 the partners began operating a retail liquor store under the name of the Party Store. They continued to operate the business through the year 1959. The building in which the Party Store business was located was acquired by the partners under a lease agreement in 1955. The partnership expended $813.24 during 1954 for improvements required to place the building in a usable condition. *116 The partners paid $600 rent on the Party Store depreciable assets in each of the years 1956 and 1957. In 1955 the partners caused to be constructed on a parcel of land purchased by them on Pat Harrison Avenue in 1954 a drive-in restaurant, known as the Hot Stop Drive-In. Later, but during the years here involved, the partners constructed another building on the Pat Harrison Avenue lot. During the latter months of 1957 the partners began construction of a motel and swimming pool located between the Fiesta Lounge and the water line of the Gulf of Mexico. The first two floors of the motel and the swimming pool were completed and opened for business in June 1958 as the Cabana Beach Motel. The third floor of the motel was finished and opened for business in 1959. After the third floor was finished, the motel contained 36 double rooms. In 1959 a wing was added to the Fiesta Lounge for a kitchen and dining room. The kitchen and dining room opened for business on or about September 1, 1959. During all the years involved herein the partners engaged in a gambling operation. 928 The partners filed a Federal Partnership Return of Income, Form 1065, for 1955 under the name of Jake *117 Mladinich & Sons. The partners filed partnership returns for the year 1956 under the names of the Party Store and Fiesta Restaurant & Lounge. Partnership returns were filed by the partners for the year 1957 under the names of the Party Store and Fiesta Restaurant & Lounge. The partnership returns for each of the taxable years 1958 and 1959 were filed under the name of Cabana Beach Motel and Fiesta Room. During the years 1955 through 1959 the partners employed part time bookkeepers. The partnership books set up by Lois Cook in 1951 were the cash receipts and disbursement type, consisting of a general ledger and a journal, cash disbursements journal, and an accounts payable journal. The bookkeepers would receive various paid receipts and invoices from the partners which they posted to the partnership books. They would receive only summaries and handwritten notations concerning business receipts. The amounts posted therefrom were never checked or otherwise verified against actual business receipts. Lois Cook, who worked for the partnership about six months in 1955, informed the partners that a credit balance existed in the cash account and that she needed additional receipts to *118 offset the balance shown therein. But Andrew Jake Mladinich advised her on each occasion not to worry about it. The partnership books contained no gambling account. However, Joe Butler, a bookkeeper, kept a ledger sheet account entitled "Fiesta Miscellaneous Gambling Income." The items of miscellaneous income reported by the partnership for 1958 and 1959 consisted of income from the gambling operations, which total amount was given to the bookkeeper at the end of each such year. The amounts of miscellaneous income reported in those years were $31,519.92 and $72,700, respectively. Initially, the 1958 partnership return was assigned to a revenue agent as a routine audit. The agent asked for and received certain books and records of the partnership. However, upon examination of the books and records, he was unable to reconcile them with the amounts reported on the 1958 return. Respondent's agent asked Joe Butler, who prepared the returns, to help him in his attempts to reconcile the reported amounts with the books. But Butler advised him that he did not have the books completed because he had nothing to do with the bank statements; that he went mostly on cash receipts and disbursements. *119 Butler considered himself an employee of the partners and never questioned the items given to him for posting to the books. The partnership records did not contain sufficient information from which a trial balance could be extracted. No inventory records were maintained which reflected transfers of merchandise from the Party Store to the Fiesta Lounge. The agent's examination revealed that the partnership maintained no daily records such as cash register receipts or records of original entry to support records of income. The partnership records were insufficient to verify the cost basis of buildings constructed by the partnership, and such basis had to be reconstructed by respondent from third party sources. The examining agents were unable to reconcile the partnership books and records with the amounts shown on the returns. Furthermore, the books and records reflected that only a few checks had been written for purchases, only a few written for wages, and that no checks had been written for band entertainment. There was no complete set of books for any year for any of the various partnership businesses. The journals were incomplete. Some of the accounts and items involved *120 in the partnership operation were missing. No books were presented for examination as to 1955 and 1956, and the records produced for examination respecting those years were very incomplete and skimpy. After examining all the partnership books and records furnished for the years 1955 to 1959, inclusive, it was determined by the agents that the income shown on the partnership returns filed for those years could not be reconciled with them. And it appeared that the amounts of taxable income reported on the individual partners' returns and the partnership returns were not consistent with the accumulation of partnership assets. Therefore, it was considered necessary that the net worth and nondeductible expenditures method of reconstructing income be used. 929 During the years 1955 through 1959 the following petty cash or cash register funds were maintained in the various businesses of the Mladinich partnership: *10 Party Store Date
Amount
December 31, 1954
$2,000
December 31, 1955
2,000
December 31, 1956
2,000
December 31, 1957
2,000
December 31, 1958
2,000
December 31, 1959
2,000 *10 Fiesta Lounge Date
Amount
December 31, 1954
$ 300
December 31, 1955
300
December 31, 1956
300
December 31, 1957
300
December 31, 1958
300
December 31, 1959
300
*121 *10 Hot Stop Drive-In Date
Amount
December 31, 1955
$ 300
December 31, 1956
300 *10 Sea-n-Sirloin Restaurant Date
Amount
December 31, 1959
$1,000 *10 Cabana Beach Motel Date
Amount
December 31, 1957
$ 500
December 31, 1958
500
December 31, 1959
500
The partnership had cash in banks on the dates and in the amounts as follows: Date
Amount
January 1, 1955
$1,172.78
December 31, 1955
1,029.04
December 31, 1956
173.49
December 31, 1957
660.73
December 31, 1958
7,313.46
December 31, 1959
8,117.17
Check No. 41, dated November 5, 1957, payable to the First National Bank of Biloxi, Mississippi, in the amount of $470, was drawn against the account of Mr. and Mrs. Jake Mladinich. The notation "to buy change" appeared on the face of the check. Check No. 1375, dated May 18, 1959, payable to Harrison Amusement Company in the amount of $200 was drawn against the Mladinich partnership Cabana Beach Motel account at the First National Bank of Biloxi, Mississippi. The notation "change - nickels" appears on the face of the check. The partnership had accounts payable in the "City Ledger" as of *122 December 31, 1959, in the amount of $1,635.81. The partnership had loans receivable on the dates and in the amounts as follows: Date
Amount
January 1, 1955
$16,901.86
December 31, 1955
7,327.80
December 31, 1956
2,775.52
December 31, 1957
0
December 31, 1958
11,800.00
December 31, 1959
6,800.00
The partnership had inventory on the dates and in the amounts as follows: Date
Amount
January 1, 1955
$ 3,165.00
December 31, 1955
12,554.26
December 31, 1956
* 16,116.93
December 31, 1957
19,115.87
December 31, 1958
15,993.64
December 31, 1959
15,234.40
On January 1, 1955, and December 31 of each of the years 1955 to 1959, inclusive, the partnership owned equipment with a cost basis as follows: Date
Amount
January 1, 1955
$ 28,617.32
December 31, 1955
* 37,051.11
December 31, 1956
44,602.58
December 31, 1957
46,394.06
December 31, 1958
103,210.98
December 31, 1959
143,001.52
On January 1, 1955, and December 31 of each of the years 1955 to 1959, inclusive, the partnership owned *123 buildings with a cost basis as follows: Date
Amount
January 1, 1955
$ 21,816.44
December 31, 1955 * 37,291.42
December 31, 1956 * 37,291.42
December 31, 1957
* 37,291.42
December 31, 1958
132,752.04
December 31, 1959
174,571.02
The partnership had land with a cost basis on the dates and in the amounts as follows: Date
Amount
January 1, 1955
$31,000.00
December 31, 1955
31,000.00
December 31, 1956
31,000.00
December 31, 1957
31,000.00
December 31, 1958
31,000.00
December 31, 1959
31,000.00
On December 31 of each of the years 1957 to 1959, inclusive, the partnership owned land on which improvements had been made with a total cost as follows: Date
Amount
December 31, 1957
$ 70.00
December 31, 1958
7,349.20
December 31, 1959
10,280.62
The partnership had construction in process with a cost basis as of the dates and in the amounts as follows: 930 Date
Amount
January 1, 1955
$ 1,032.24
December 31, 1955
0
December 31, 1956
0
December 31, 1957
9,044.91
December 31, 1958
15,686.15
December 31, 1959
11,081.56
*124 On January 1, 1955, and December 31 of each of the years 1955 to 1959, inclusive, the partnership owned yachts with a cost basis as follows: Date
Amount
January 1, 1955
$ 2,786.14
December 31, 1955
2,786.14
December 31, 1956
* 14,800.18
December 31, 1957
** 16,245.84
December 31, 1958
** 16,245.84
December 31, 1959
3,000.00
On January 1, 1955, and on December 31 of each of the years 1955 and 1956, the partnership had $185 on deposit in escrow. On July 15, 1957, the partners placed an additional amount of $500 in escrow with the American Guild of Variety Artists in connection with the Fiesta Employers Band. On December 31 of each of the years 1955 to 1958, inclusive, the partnership had a deposit on utilities in the amount of $75. During 1959 the partnership made a *125 $150 meter deposit with the Mississippi Power Company. The partnership had accounts payable (merchandise and construction) on the dates and in the amounts as follows: Date
Amount
January 1, 1955
$ 4,155.16
December 31, 1955
6,273.27
December 31, 1956
3,878.20
December 31, 1957
6,527.01
December 31, 1958
35,129.61
December 31, 1959
30,301.14
The partnership had notes payable (equipment) on the dates and in the amounts as follows: Date
Amount
December 31, 1955
$ 1,608.75
December 31, 1956
3,825.81
December 31, 1957
1,227.16
December 31, 1958
32,556.06
December 31, 1959
37,039.02
The partnership had notes payable (loans) on the dates and in the amounts as follows: Date
Amount
January 1, 1955 * $ 19,500.00
December 31, 1955
* 20,030.45
December 31, 1956
$ 9,032.23
December 31, 1957
3,034.32
December 31, 1958
61,310.27
December 31, 1959
57,165.10
The partnership had notes payable (land) on the dates *126 and in the amounts as follows: Date
Amount
January 1, 1955
$ 3,300.00
December 31, 1955
2,000.00
December 31, 1956
1,400.00
December 31, 1957
750.00
December 31, 1958
150.00
The partnership had a reserve for depreciation (equipment) on the dates and in the amounts as follows: Date
Amount
January 1, 1955
$ 8,887.81
December 31, 1955
12,583.58
December 31, 1956
16,586.22
December 31, 1957
20,898.99
December 31, 1958
28,927.62
December 31, 1959
44,013.50
The partnership had a reserve for depreciation (buildings) on the dates and in the amounts as follows: Date
Amount
January 1, 1955
$ 4,152.52
December 31, 1955
5,251.07
December 31, 1956
6,441.16
December 31, 1957
7,631.25
December 31, 1958
11,207.86
December 31, 1959
18,097.13
Each of the partners had withdrawals in the amount of $6,979.13 from the Jake Mladinich & Sons partnership during 1955. During 1955 John Mladinich received a withdrawal from the partnership in the amount of $1,819.49 in the form of a credit on the down payment of a house from Fayard & Gautier. During 1956 Jake, Sr., and Mary Mladinich withdrew $3,488.18 and $3,488.17, *127 respectively, from the Party Store partnership for a total of $6,976.35. John and Andrew Jake each in 1956 withdrew $3,488.17 from the Party Store partnership. During 1956 Andrew Jake and John each withdrew $100 from the Fiesta Restaurant & Lounge partnership. During 1957 Andrew Jake received a withdrawal from the partnership in the amount of $2,775.52 in the form of a credit on the down payment of a house purchased from Fayard & Gautier (Realtors). Such 931 amount was credited against an amount owed the partnership by Fayard & Gautier. The partners had partnership withdrawals of income during 1957 and 1958 in the form of personal checks written by the respective partners against the "Mr. or Mrs. Jake Mladinich" account at the First National Bank, Biloxi, Mississippi, in the total amounts as follows: Year
Jake, Sr.
John
Andrew Jake
1957
$2,677.27
$2,036.58
$6,132.23
1958
3,158.12
3,433.89
3,171.51
The partners had partnership withdrawals of income during 1957 and 1958 in the form of personal checks written by the respective partners against the "Jake Mladinich & Sons" account at the Hancock Bank, Gulfport, Mississippi in the total amounts *128 as follows: Year
Jake Sr.
John
Andrew Jake
1957
$601.32
$814.21
$2,327.72
1958
28.55
The partners had partnership withdrawals of income during the years 1958 and 1959 in the form of personal checks written by the respective partners against the "Cabana Beach Motel" account at the First National Bank of Biloxi, Mississippi, in the total amounts as follows: Year
Jake, Sr.
John
Andrew Jake
1958
$1,283.21
$1,853.80
$1,614.55
1959
6,083.51
6,550.58
4,935.86
The respective partners had partnership withdrawals in the form of deposits made to personal savings and checking accounts in the years and in the total amounts as follows: Savings account entitled "Mr. or Mrs. John Mladinich" at the Peoples Bank of Biloxi, Mississippi Year
Amount
1956
$ 200.00
1957
761.00
1958
795.88
1959
1,469.33
Checking account entitled "Mrs. John Mladinich" at the Peoples Bank of Biloxi, Mississippi Year
Amount
1955
$ 876.02
1956
1,898.89
1957
2,312.00
1958
3,556.35
1959
4,951.04
Checking account entitled "Mr. or Mrs. Andrew Jake Mladinich" at the First National Bank of Biloxi, *129 Mississippi Year
Amount
1956
$1,000.00
1957
3,942.00 Year
Amount
1958
5,225.00
1959
8,580.00
During the years involved in the respondent's examination the partners wrote no checks for cash. Cash was needed by each of the partners during these years for everyday living expenses. Therefore, a $2,500 amount in each of the years 1955 to 1959 is a reasonable amount to be attributed to each partner to reflect currency taken out of the business for such expenses. The Hot Stop Drive-In building was constructed by the Mladinich partnership on land they owned on Pat Harrison Avenue. The operation of the Hot Stop Drive-In Restaurant was begun in January or February 1955. During 1956 the operation was a partnership between John Mladinich and his father-in-law, A. L. Rowe. During 1956 the assets of the Hot Stop Drive-In operation were leased by the partners, John Mladinich and A. L. Rowe, from the Mladinich partnership. In April 1957 Rowe began operating the Hot Stop Drive-In as a sole proprietorship, paying rent to the Mladinich partnership in the amount of $300 per month. Such arrangement continued through the year 1959. An illegal gambling operation *130 was conducted by the partners during each of the years 1955 through 1959. Adequate books and records were not maintained to reflect the partnership gambling operation in any of these years. In 1957, Joe Butler, the bookkeeper, "plugged" the partnership income shown on the books with a $25,000 amount because the books were "short" on income. This amount was used by Butler as an arbitrary figure, after discussing it with John Mladinich, to increase the partnership income so that the Party Store and Fiesta Lounge operations would not reflect a loss. According to the books of the partnership, net losses on business operations during the years 1955 to 1959, inclusive, aside from the gambling operation which was not recorded on the books, were as follows: Year
Net Loss onBooks
1955
$19,361.29
1956
19,321.65
1957
32,13 9.73
1958
9,614.18
1959 9,268.14
Total
$89,704.99
Respondent determined that the total amounts of partnership ordinary income 932 during the years 1955 to 1959, inclusive, were as follows: Year
Amount
1955
$ 66,486.57
1956
66,761.02
1957
81,378.18
1958
97,268.14
1959 98,569.29
Total
$410,463.20
Respondent *131 determined that the ordinary income of the partnership was understated in each of the taxable years 1955 to 1959, inclusive, as follows: Year
AmountReported onReturns
CorrectedAmount
Under- statement
1955
$ 16,743.01
$ 47,125.28
$ 30,382.27
1956
10,566.81
47,439.37
36,872.56
1957
35,935.27
49,238.45
13,303.18
1958
44,866.49
87,653.96
42,787.47
1959 63,431.86
89,301.15
25,869.29
Total
$171,543.44
$320,758.21
$149,214.77
During the initial contacts with petitioners during the latter part of 1959 and 1960 in connection with the examination of their individual income tax returns for the years 1955 through 1959, they were asked for amounts of cash on hand as of January 1, 1955. The first mention to respondent's agents of the existence of a cash hoard was made by petitioners' representative, W. E. Logan, at a conference between him and the agents, John Montgomery and Joe Fail, on December 18, 1961. The $35,000 amount of the claimed cash hoard as of January 1, 1955, was not revealed until petitioners' representative had been presented with the proposed adjustments to partnership income. On April 17, 1967, United States District Judge *132 Harold Cox, Southern District of Mississippi, Southern Division, filed his findings of fact and conclusions of law in a suit for refund, Civil Action No. 2694, which had been filed by or on behalf of Jake Mladinich, Sr., and Mary Mladinich. That suit involved the taxable year 1956, which is one of the years involved in the respondent's determination of partnership income through the use of the net worth and nondeductible expenditures method. The findings of facts and conclusions of law rendered therein are as follows: FINDING OF FACTS 1. This is a suit instituted by the plaintiffs, Jake Mladinich, Sr. and Mary Mladinich, for the recovery of $1,750.51, plus interest, paid to the government as deficiencies in federal income tax, interest and the 50% fraud penalties for the taxable year 1956. In addition, the government filed a counter claim in the amount of $1,658.24, which included federal income tax, interest, and the 50% fraud penalties for the year 1956. 2. Taxpayers' business is operated as a family partnership with taxpayers' two sons. Each of the three partners, Jake Mladinich and his two sons, have an equal partnership interest. The business owns and operates a motel, *133 restaurant, a nightclub and package liquor store. In addition, the partnership owns the assets of the Hot Stop Drive-In Restaurant which is rented to a separate partnership owned in equal shares by one of the sons and his father-in-law. This separate partnership operates the Hot Stop Drive-In Restaurant. 3. Since the records of the partnership were admitted-incomplete and no records were kept of the gambling activities incident to the nightclub, the Commissioner, acting under the authority of Section 446(b) of the Internal Revenue Code of 1954, reconstructed the taxpayers' income for the taxable year 1956 on a net worth basis. Holland v. United States, 348 U.S. 121. In addition, taxpayers' attempts to contradict the government's net worth computations utilizes the same method. 4. The entire record before the Court indicates a pattern of conduct calculated to obstruct, confuse, and distort the computation of the proper income taxes due to the government for the taxable year 1956. From the outset, taxpayers refused to answer pertinent questions put to them by the Internal Revenue Agents working the case. This refusal to answer questions, and *134 evasive responses when any attempt to answer was made, continued up to and including the trial of this matter. The Court found it necessary to admonish the taxpayer on cross-examination on several occasions to respond to questions put to him. 5. It is uncontroverted that if a complete set of books and records was kept by the taxpayer, as alleged by his bookkeeper, this complete set of business books and records was never produced for examination. Although taxpayer alleges that all of the available records were produced for the Internal Revenue Service, it is the opinion of this Court that such records were concealed until produced in response to subpoenas duces tecum and the taking of depositions in July 1965. 6. The most flagrant example of taxpayers' patently false assertions is their insistence upon the existence of a $35,000 933 cash hoard which declined exactly $10,000 during 1956. They assert that this bankroll had been buried for many years, while later it was said to have been kept in a safe at taxpayers' home and on the persons of his sons. No record was ever made of the existence of this money. No individual other than taxpayer and his two sons was ever aware of its *135 existence. Jake Mladinich, Sr., indicated that he was afraid of banks and that he kept the money as a reserve for gambling losses. His bookkeeper and the manager of his gambling establishment knew nothing of the hoard, and one witness, a former dice dealer, conclusively negatived the need for such a bankroll since a third party was bankrolling the venture. 7. Every taxpayer is required to maintain an adequate set of books and records. The destruction or concealment of these records is indicative of a fraudulent intent to evade taxes; here despite repeated requests for books and records, the taxpayers produced none until the taking of depositions. This fact, coupled with repeated inability or unwillingness of taxpayers to answer questions or produce documents, the evasiveness or refusal of the taxpayers and their witnesses to answer pertinent questions at all stages of the action, and the obviously false testimony of the cash hoard, are sufficient to demonstrate that the returns were false and were filed fraudulently with intent to evade taxes. The entire case reveals, from start to finish, a pattern of concealment. Clearly, a pattern of conduct calculated to evade taxes has been *136 established and an intent to defraud has been proven. 8. The largest single item of disagreement has to do with the cash hoard discussed previously. Plaintiffs assert that a cash hoard of $35,000 was in existence at the beginning of 1956, and that due to gambling losses, this cash hoard was reduced by exactly $10,000 at the end of the year. As indicated, the Court finds this allegation totally false. It is the finding of this Court that the taxpayer has not established that there was any cash on hand at the beginning or end of the year and that the Commissioner's determination of a zero balance for the item entitled cash on hand outside bank accounts is correct. 9. With respect to two of the disagreed items, the escrow deposit, and the utilities deposit, there is no disagreement as to the amount appearing on the net worth statement, but only as to the propriety of including these amounts on the net worth statements. Both items appear on taxpayers' 1955 return, and the escrow deposit appears on the 1956 return, there is no evidence adduced by the taxpayers of a withdrawal of that amount during 1956, and since the same buildings were admittedly owned at the end of 1956, the Commissioner's *137 determination must be sustained. 10. The other two items appearing on the net worth schedule, which are in disagreement, concertn assets utilized in the business known as the Hot Stop Drive-In Restaurant. Taxpayers admit that these assets were owned by the family partnership. Their argument for the exclusion of these items from the net worth statement apparently rests upon the theory that credit for the income of the Hot Stop Drive-In Restaurant was not given to the partners. The net worth method of reconstruction of income in no way utilizes income, as such. The only way income may properly appear on a net worth statement is when that income is utilized to purchase assets, which are then properly includable in the net worth statement. It is, therefore, the finding of the Court that the Hot Stop Drive-In Restaurant's assets were properly included in the net worth statement, and that the depreciation accounts appearing on the government's net worth statement are correct as stated. 11. The remaining point of disagreement on the net worth statement concerns estimated amounts of personal living expenses attributed to each of the three partners. The government, at trial, conceded the *138 $2,500 item of personal estmated living expenses to one of the sons. It is obvious that taxpayers would withdraw amounts of cash for personal living expenses from time to time. The testimony of taxpayers' daughter-in-law, their bookkeeper, was essentially a summary of the personal checks drawn by the taxpayers and their sons during the taxable period. This testimony revealed no withdrawals of cash. This Court, therefore, finds that the amounts of estimated personal living expenses, shown on the government's net worth statement, modified by its concession at trial, are correct. 12. With respect to the government's claim, the amounts shown on the net worth statement, attributable to assets discovered upon production of taxpayers' partial books and records, are not in dispute. Taxpayers dispute only the propriety of including these items on the net worth statement. Since plaintiff's own books are the source of the information which is the basis of the increase in net worth generating the government's counter claim, and no evidence was presented which would indicate that these assets were not owned by the taxpayers during 1956, these adjustments to the original net worth statement are *139 correct and proper. 934 CONCLUSIONS OF LAW 1. Although the Commissioner's determination of the net worth of taxpayers is presumed to be correct, the burden of proving fraud, by clear and convincing evidence, is on the government. Carter v. Campbell, 264 F. 2d 930; Goldberg v. Commissioner, 239 F. 2d 316; Breland v. United States, 323 F. 2d 492. The burden of proving by a preponderance of the evidence that the Commissioner's underlying assessments (the net worth statement) to be erroneous is on the plaintiffs. Carter v. Campbell, supra; Goldberg v. Commissioner, supra; Breland v. United States, supra; and Snell Isle, Inc. v. Commissioner, 90 F. 2d 481. The same burdens of proof apply as well to the counter claim filed by the government under the provisions of Section 7422(e) of the Internal Revenue Code of 1954. That is, the government must prove by clear and convincing evidence that some part of any understatement of federal income taxes on the return of the plaintiffs was due to a willful evasion of the payment of federal income taxes; on the other *140 hand, the taxpayers, to avoid the payment on the additional tax assessed by the government, must prove by a preponderance of the evidence that the Commissioner's determination of any underpayment was erroneous. 2. It is the finding of this Court that the defendant has shown by clear and convincing evidence that the understatement of taxes by the plaintiffs on their 1956 income tax return was a willful attempt to evade the payment of the federal income tax properly due and owing by them, as indicated in the preceding findings. 3. It is the finding of this Court that the taxpayers have failed to sustain their burden of proving that the Commissioner's determination of the tax properly due is erroneous. The assessment of additional taxes, penalties and interest is based upon the net worth method. The net worth method is probably the most frequently used way of computing taxable income in civil income tax cases, and has been repeatedly endorsed by the courts. Holland v. United States, 348 U.S. 121. Essentially, this method requires the establishment of the taxpayers' net worth at the beginning of the taxable period, in this case, January 1, 1956, and at the end of that *141 taxable period, December 30, 1956. The difference in these two amounts, with certain mathematical adjustment, is the taxble income for the taxpayers for the year. The net worth schedules involved herein are almost totally agreed upon. It is the finding of this Court that with the exception of the government's partial concession of estimated living expenses, the defendant's net worth schedules including the items involved in the counter claim are correct as presented at trial. 4. Section 6653 of the Internal Revenue Code of 1954 provides that if any part of an underpayment is due to fraud, the 50% penalty will attach. Since the government proved by clear and convincing evidence that the underpayment of taxes for the year 1956 was due to fraud, the fraud penalties also attached to the deficiency resulting from the counter claim. 5. It is, therefore, this Court's conclusion that the government's net worth statement, as presented to this Court, is correct and that the deficiency resulting therefrom (modified by the partial concession of personal living expenses) is correct and that the fraud penalties were properly imposed. Jake Mladinich, Sr., has died and *142 his personal representative should be substituted as plaintiff herein. A judgment accordingly may be presented. On May 18, 1967, a judgment, in accordance with the findings and conclusions of Judge Cox, was entered. An appeal was taken therefrom which was affirmed in Mary Mladinich and Mary Mladinich, Administratrix of Estate of Jake Mladinich, Sr. v. United States, 394 F. 2d 147 (C.A. 5, 1968). No petition for certiorari was filed. Andrew Jake Mladinich and John M. and Virginia Mladinich, Docket Nos. 3151-63 and 3409-63, each had long term capital gains in 1956 in the amount of $60.65. The 1958 income tax return of Jake, Sr., and Mary Mladinich contained a mathematical error of $480. As alleged in respondent's amendments to answers in Docket Nos. 3151-63 and 3409-63, the partnership had additional notes payable (loans) as of December 31, 1954, and December 31, 1955, of $5,000 over that shown in respondent's net worth computation reflected in the notice of deficiency. During the years 1955 to 1959 the partnership owned various boats. One was the "Seacat" which was renamed the "Fiesta." The "Fiesta" was an 85 foot air sea rescue boat which accommodated from 50 *143 to 60 persons. It was used to entertain prospective customers and to promote the partnership business. It was also used to entertain 935 partnership employees. At times, when the pressure from local authorities made gambling at the Fiesta Lounge difficult, the gambling operation was conducted in the docked "Fiesta." During 1959 the "Fiesta" was sold at a loss of $6,245.84. As alleged in respondent's amendments to answers in Docket Nos. 3151-63 and 3409-63, the partnership had additional cost basis of yachts, as of December 31 of the years 1956, 1957 and 1958, over that reflected in the net worth statement attached to the notice of deficiency, in the respective amounts of $7,795.15, $3,995.15 and $3,995.15. Petitioners executed consents, Form 872, extending the statute of limitations on assessments of income taxes for the years 1957, 1958 and 1959 until June 30, 1963. The notices of deficiencies were mailed to petitioners on June 14, 1963. Ultimate Findings 1. The books and records of the Mladinich partnership were inadequate and incomplete for the years 1955 through 1959. 2. Respondent properly used the net worth plus nondeductible expenditurs method of reconstructing *144 partnership income for the years 1955 through 1959. 3. The Mladinich partnership income was substantially understated in each of the years 1955 through 1959. 4. The Mladinich partnership did not have a $35,000 cash hoard on hand as of January 1, 1955. 5. The assets of the Hot Stop Drive-In Restaurant were properly included in respondent's net worth statement. 6. Respondent's $2,500 addition to each of the partners' withdrawals during the years in issue was not arbitrary and unreasonable. 7. The partners have failed to establish that they are entitled to deductions in 1955 of $5,042.19 each for a claimed carryover of a partnership net operating loss for 1954. 8. For each of the years 1955 through 1959 a part of the underpayment of tax by the petitioners was due to fraud with intent to evade tax, and each of their Federal income tax returns for those years was a false and fraudulent return with intent to evade tax. 9. Assessments of income tax deficiencies against petitioners for the years 1955 through 1959 are not barred by the statute of limitations. Opinion Issue 1 - Use of the Net Worth Method As indicated in our findings of fact and our first ultimate finding, *145 the Mladinich partnership books and records were grossly inadequate and incomplete during the years 1955 through 1959. Since the partnership books and records were inadequate from the standpoint of accounts maintained, and incomplete by reason of missing accounts and items, respondent's agents were unable to reconcile the amounts of income shown on the partnership returns fild for such years with the books and records. It further appeared that the amounts of taxable income reported on the individual and partnership returns for those years were insufficient to account for the accumulation of the assets acquired by the Mladinich partnership. Accordingly, it was necessary for them to reconstruct the correct partnership taxable income by use of the net worth and nondeductible expenditures method. The use of the net worth method of reconstructing a taxpayer's correct taxable income was approved by the Supreme Court in Holland v. United States, 348 U.S. 121 (1954). It is settled law that where a taxpayer has failed to keep books or records from which his correct income can be ascertained, *146 the Commissioner has the right to look elsewhere for evidence of such income. Anderson v. Commissioner, 250 F. 2d 242 (C.A. 5, 1957), certiorari denied 356 U.S. 950 (1958); Merritt v. Commissioner, 301 F. 2d 484, (C.A. 5, 1962); Cefalu v. Commissioner, 276 F. 2d 122 (C.A. 5, 1960). The question is not as to the proper method of accounting, but whether the books and records are sufficient to objectively ascertain the true amount of income. See Thomas B. Jones, 29 T.C. 601 (1957). When there are inadequate and incomplete records, the choice of the method of reconstructing income lies with the Commissioner, not the taxpayer. United Dressed Beef Co., 23 T.C. 879 (1955). Substantial increases in net worth beyond those indicated possible by the income disclosed in the books are in themselves evidence that the books are not trustworthy. Frank Imburgia, 22 T.C. 1002 (1954). And even the fact that books may *147 appear superficially adequate does not 936 preclude the use of the net worth method. H. A. Hurley, 22 T.C. 1256 (1954), affd. 233 F. 2d 177 (C.A. 6, 1956); and see the concurring opinions in Lowell F. Bushnell, 49 T.C. 296, 310-312 (1967). Once an increase in net worth is established and the facts are such as to give rise to an inference that the increase stemmed from unreported income, use of the net worth method is appropriate. The only restriction against its use is that it be reasonable. Estate of Rau v. Commissioner, 301 F. 2d 51 (C.A. 9, 1962), certiorari denied 371 U.S. 823 (1962). We conclude on this record that respondent was justified in determining the partnership taxable income for the years in issue by using the net worth plus nondeductible expenditures method. [3]
Issue 2 - Determinations of Taxable Income Many of the items contained in respondent's net worth statement are *148 agreed to by the parties and are set forth in the stipulation of facts. However, some of the items are in dispute and will be discussed below. We agree with petitioners that they had some petty cash on hand as of December 31 in each of the years 1954 to 1959, inclusive. Our findings of fact show the amounts thereof. We also agree with petitioners as to certain additional amounts of accounts payable for merchandise and construction and notes payable for equipment, and our findings of fact so reflect. Petitioners attack as arbitrary and unreasonable respondent's determination that each partner had cash withdrawals of $2,500 in each of the years involved. We find no merit in the attack. Respondent determined that the partners had personal withdrawals of income from the partnership. Since the records produced with respect to the years 1955 and 1956 were so skimpy and incomplete that the amounts of withdrawals could not be determined, the personal withdrawals shown on the partnership returns filed for those years were used in respondent's computation. These amounts are uncontradicted. Additionally, in 1955, John Mladinich had a withdrawal from the partnership in the amount of $1,819.49 *149 in the form of a credit when realtors, Fayard and Gautier, credited a debt which they owed the partnership with that amount. The $1,819.49 was a downpayment on a house purchased from Fayard and Gautier by John and Virginia Mladinich. The same type of credit was given Andrew Jake when he purchased a house in 1957. The partnership loans receivable account was likewise credited with $2,775.52 representing the downpayment on Andrew Jake's house. As to the years 1957, 1958 and 1959, cancelled checks and bank statements were available for examination. Through an analysis of the checks and bank statements respondent determined certain of those checks which had been written for personal items. Virginia Mladinich testified that she found very little difference in her figures in this regard and those in respondent's determination, except for some confusion between Andrew Jake and his father, Jake, Sr. She stated that in some instances her analysis of such personal withdrawals resulted in greater amounts than those shown in respondent's analysis. In effect, therefore, petitioners agree with the amounts of withdrawals determined by an analysis of the checks written by the partners on the partnership *150 bank accounts. Respondent also included in his determination of partnership withdrawals deposits made to the personal bank accounts of the partners. The basis for such inclusion was the fact that any such deposits would have had to come from the partnership. There were no checks found written to cash on the partnership accounts, and in practically every instance the deposits were in currency. There is no evidence that the deposits to the personal savings and checking accounts of Andrew Jake and John were not in currency. We think the $2,500 additional amount constitutes a reasonable estimate of cash withdrawals by each partner in each year for personal living expenses. Respondent's examination revealed no checks which had been written by the partners to cash. Since it is normal and natural for cash to be used for everyday needs, the $2,500 amount was arrived at by respondent's agents as a reasonable estimate, considering the living standards to which the partners were accustomed. Under these circumstances we hold that petitioners have not carried their burden of proving that respondent's 937 determination as to this item is incorrect and therefore, we sustain it. [4] Anderson *151 v. Commissioner, We likewise reject petitioners' assertion that the assets of the Hot Stop Drive-In Restaurant were improperly included in respondent's net worth statement. Apparently this is based on their claim that certain unspecified assets were purchased with income from the Hot Stop partnership. The only evidence submitted in this regard is a journal entry indicating that the Hot Stop partnership made some payments on restaurant equipment. There is no evidence to show when the asset was purchased or if it had been included in the partnership net worth computation. In any event, the accounting witness of petitioners testified that Jake Mladinich and sons owned the Hot Stop assets, and this is supported by the partnership returns. Petitioners also argue that when the respondent included the Hot Stop assets in the net worth computation of the Mladinich partnership, it had two effects: (1) It attributed income of A. L. *152 Rowe earned from the Hot Stop to the Mladinich partnership; (2) it attributed income of John Mladinich earned from the Hot Stop partnership to his brother and father. We fail to see how the income of the Hot Stop partners, A. L. Rowe and his son-in-law, John Mladinich, could affect the net worth determination of the Mladinich partnership. Certainly there was no showing that such income was used to purchase Mladinich partnership assets. The facts are that the Mladinich partnership owned the assets involved in the Hot Stop operation during the years involved herein and, accordingly, such assets were properly included in respondent's determination of partnership net worth. [5]
The principal assault made by petitioners on the net worth determination is that respondent failed to give the partners credit for a claimed "cash bank roll" of $35,000 on hand as of December 31, 1954. They contend that the failure to do so was arbitrary and unreasonable. They contend that the $35,000 was reduced by exactly $10,000 in 1956, and by exactly $10,000 in 1957, and by exactly $11,000 *153 in 1959, at which time they assert only $4,000 of the $35,000 amount remained. Andrew Jake and John Mladinich testified that they assumed the $35,000 represents the life savings of Jake Mladinich, Sr., now deceased. Jake, Sr., had never mentioned to them any savings prior to that time. Andrew Jake and John testified that they first knew about the cash hoard in 1950 when they were about 22 and 21 years of age, respectively. They testified that there was no special occasion but that Jakk, Sr., called them together and revealed that he had placed $35,000 in a safe in an upstairs room in his home. It is contended that they never saw the $35,000 until 1954, prior to the time the partnership began its gambling operation. However, the safe is supposed to have been in Andrew Jake's room, and he knew the combination to the safe. Andrew Jake and John testified that in 1954 they, and Vincent Palazzolo, now a dealer and box man at the Golden Nugget in Las Vegas, met with Jake, Sr., in his living room; and on that occasion Jake, Sr., went upstairs and brought down the $35,000. They say that the $35,000 was divided up, $10,000 each to Andrew Jake and John, and $15,000 which Jake, Sr., retained. *154 Vincent Palazzolo testified that he was present on that occasion and saw the money counted out. We are convinced that the testimony relating to the $35,000 cash hoard is false. [6] First, contrary to the testimony that Vincent Palazzolo was present when the "bank roll" was distributed, Jake, Sr., testified at the trial of the refund suit that no one knew of the existence of the $35,000 cash hoard but himself, his wife, Mary, and the boys, Andrew Jake and John. And John testified at that trial that, as far as he knew, no one else except him, his brother and father knew of the bank roll. Usually time works against a memory. It is inconceivable that John could recall in 1969 all of those who were present in 1954 at the unveiling of a $35,000 cash hoard, when both he and his father apparently did not remember it at the trial of the refund suit in 1965. The so-called third party "eye witness," Vincent Palazzolo, in an interview with respondent's agent on June 5, 1962, stated that he had never seen a bank roll that the Mladinichs *155 had; and that he had never discussed the amount of the bank roll that 938 they had available for their gambling activities. This is in direct conflict with his testimony at the trial of the instant case. His testimony is likewise contrary to the testimony of Jake, Sr., and John at the trial of the refund suit in 1965. We regard Palazzolo's testimony that he witnessed the $35,000 cash hoard as a fabrication. On cross-examination by respondent's counsel, Palazzolo said that he could not remember if he had stated in an interview with the special agent that he did not know how much of a bank roll the Mladinichs had. However, when pressed, he explained that he did not remember because "there was nothing binding in those interviews." We find Palazzolo's testimony unworthy of belief on this point. Moreover, we think it is significant that the existence of a bank roll was not mentioned until December 18, 1961, some two years after the respondent's examination had begun, and that the $35,000 amount was not revealed until after petitioners' counsel had been advised of the proposed adjustments. In addition, it is admitted that at the time the beginning cash hoard was supposed to have been *156 in existence, mortgages were obtained by Jake, Sr., on his property. Petitioners contend that a bank roll is necessary in every gambling operation, and that this supports their cash hoard claim. However, both Andrew Jake and John testified that they had "soft action, tourist type people" in their gambling room and they never got "high rollers." Also, Vincent Palazzolo, in an interview with respondent's agents on June 5, 1962, stated that they (the partners) usually had a change fund of from $300 to $400 on the table, and whenever he needed more money to pay off a big winner, they would get the money out of the safe. This tends to refute petitioners' contention what a bank roll was carried on the person of Andrew Jake and John. The stated reductions of the $35,000 claimed cash hoard over the years involved herein are illogical and inconsistent with the operation. The partners testified that as of December 31, 1956, the amount was reduced to $25,000. Why would the cash hoard be reduced and not replenished when, as the partners testified, 1956 was a bad year? It seems reasonable that a bad year would have had the opposite effect on the amount of a gambling bank roll. The claimed bank *157 roll is asserted to have been further reduced to $15,000 in 1957 and still further to $4,000 in 1959. Again the reasons given are that only "soft action, tourist type" gamblers would come in their place, and that through experience they found it was not necessary to have a large bank roll. It is unreasonable that it would take three to four years to gain sufficient experience to realize that it did not take a large bank roll for their "slow grind" gambling operation. The partners testified as to the stakes involved that it took only a few months for them to decide that the $25-$50 limit should be changed to $50-$100. It is inconsistent that the bet limits were raised at a time when experience was being gained on a "soft action" operation. It is also inconsistent for bet limits to be raised, and during the same time experience is indicating the necessity of a smaller bank roll. We believe petitioners' contentions regarding the reductions of the cash hoard claim over the years are untenable. It is clear from this record that the taxable income of the Mladinich partnership was substantially understated for the years 1955 through 1959. We realize that *158 reasonable accuracy in a net worth determination is of vital importance. See Holland v. United States, supra; Thomas v. Commissioner, 223 F. 2d 83 (C.A. 6, 1955). Although respondent's net worth computation herein is not completely correct in every respect, we think it is reasonably accurate. The very nature of a determination of unreported income by an indirect method precludes the likelihood of such computation being mathematically precise, Schroeder v. Commissioner, 291 F. 2d 649 (C.A. 8, 1961), but even if part of the determination is wrong, this does not destroy its presumption of correctness. Webb v. Commissioner, 394 F. 2d 366 (C.A. 5, 1968). Accordingly, we sustain respondent's determinations subject to the modifications contained in our findings of fact. Cf. Cefalu v. Commissioner, supra.
Issue 3 - Collateral Estoppel Respondent strongly urges that this Court apply the doctrine of collateral estoppel, or estoppel by judgment, as it is sometimes called, to prevent the relitigation in the instant case of (1) the propriety of respondent's use of the net *159 worth method, (2) the correctness of various items contained in the net worth computation, and (3) the claim that a $35,000 partnership cash hoard existed as of December 31, 1954. 939 On April 17, 1967, the United States District Court for the Southern District of Mississippi, Southern Division, filed its findings of facts and conclusions of law in the case of Jake Mladinich, Sr., and Mary Mladinich v. United States of America, Civil Action No. 2694. That case involved a claim for refund for the taxable year 1956. The 1956 year in that case is involved in the respondent's determination of correct partnership income herein by use of the net worth method. The District Court's decision was affirmed in Mary Mladinich & Mary Mladinich, Administratrix of Estate of Jake Mladinich, Sr. v. United States, 394 F. 2d 147 (C.A. 5, 1968). Among the issues litigated in the District Court case were: (1) the respondent's use of the net worth method, (2) the correctness of certain items of the net worth statement, and (3) the claim that a $35,000 partnership cash hoard existed as of December 31, 1954. The Court, after a full hearing, held against the taxpayers on all the issues *160 litigated therein. The District Court's findings of fact and conclusions of law are set out in full in our findings of fact. It is the principle of collateral estoppel that generally only one opportunity be given to litigate an issue. Fairmount Aluminum Co., 22 T.C. 1377 (1954), affd. 222 F. 2d 622 (C.A. 4, 1955), certiorari denied 350 U.S. 838 (1955). Collateral estoppel applies in a different cause of action and precludes relitigation of issues which were presented, litigated, and decided in a prior proceeding between the same parties or persons in privity with them. Cromwell v. County of Sac, 94 U.S. 351 (1876); Tait v. Western Maryland Ry. Co. 289 U.S. 620 (1933). The doctrine is premised upon the theory that litigation of identical issues in more than one action between the same parties or their privies serves no useful purpose, but rather tends to defeat the ends of justice. Fairmount Aluminum Co., supra.The Supreme Court stated in the landmark case of Commissioner v. Sunnen, 333 U.S. 591, 598-601 (1948): *161 These same concepts are applicable in the federal income tax field. Income taxes are levied on an annual basis. Each year is the origin of a new liability and of a separate cause of action. Thus if a claim of liability or non-liability relating to a particular tax year is litigated, a judgment on the merits is res judicata as to any subsequent proceeding involving the same claim and the same tax year. But if the later proceeding is concerned with a similar or unlike claim relating to a different tax year, the prior judgment acts as a collateral estoppel only as to those matters in the second proceeding which were actually presented and determined in the first suit. Collateral estoppel operates, in other words, to relieve the government and the taxpayer of "redundant litigation of the identical question of the statute's application to the taxpayer's status." Tait v. Western Md. R.Co., 289 U.S. 620, 624. * * * And so where two cases involve income taxes in different taxable years, *162 collateral estoppel must be used with its limitations carefully in mind so as to avoid injustice. It must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged. * * * Of course, where a question of fact essential to the judgment is actually litigated and determined in the first tax proceeding, the parties are bound by that determination in a subsequent proceeding even though the cause of action is different. See The Evergreens v. Nunan, 141 F. 2d 927. And if the very same facts and no others are involved in the second case, a case relating to a different tax year, the prior judgment will be conclusive as to the same legal issues which appear, assuming no intervening doctrinal change. But if the relevant facts in the two cases are separable, even though they be similar or identical, collateral estoppel does not govern the legal issues which recur in the second case. Thus the second proceeding may involve an instrument *163 or transaction identical with, but in a form separable from, the one dealt with in the first proceeding. In that situation, a court is free in the second proceeding to make an independent examination of the legal matters at issue. It may then reach a different result or, if consistency in decision is considered just and desirable, reliance may be placed upon the ordinary rule of stare decisis. In view of the facts found and conclusions reached on the record before us in this case, we find it unnecessary to rely or apply the doctrine of collateral estoppel with respect to the two partners (the sons of Jake, Sr.) who were not parties in the refund suit. [7] Suffice it to say, however, that we have carefully considered and given 940 considerable weight to the District Court's decision for the year 1956 because under these circumstances "consistency in decision is considered just and desirable." Commissioner v. Sunnen, supra at p. 601; and cf. Thomas v. Commissioner, 324 F. 2d 798 (C.A. 5, 1963). *164 Issue 4 - Additions to Tax under Section 6653(b) Petitioners contend that respondent has failed to prove fraud by clear and convincing evidence for any of the years 1955 through 1959 and therefore the additions to tax under section 6653(b) are inapplicable. Respondent counters with the contention that at least a part of the underpayment of tax for each year was due to fraud, and that he has met his burden of proof. See Carter v. Campbell, 264 F. 2d 930 (C.A. 5, 1959); Ginsberg v. Commissioner, 271 F. 2d 511 (C.A. 5, 1959); and United States v. Chapman, 168 F. 2d 997 (C.A. 7, 1948). It is clear, and we have found on the evidence presented, that petitioners substantially understated their taxable income over the 5-year period before us. It is now well established that in a tax fraud case "consistent failure to report substantial amounts of income over a number of years, standing alone, is effective evidence of fraudulent intent." Schwarzkopf v. Commissioner, 246 F. 2d 731, 734 (C.A. 3, 1957), affirming a Memorandum Opinion of this *165 Court; Kurnick v. Commissioner, 232 F. 2d 678 (C.A. 6, 1956), affirming a Memorandum Opinion of this Court. In Merritt v. Commissioner, supra at p. 487, the Court of Appeals for the Fifth Circuit stated: Consistent and substantial understatement of income is by itself strong evidence of fraud. This proof, coupled with the showing that the records were both incomplete and inaccurate, and that the petitioner did not supply the bookkeeper with all of the data necessary for maintaining complete and accurate records, is enough to warrant the Tax Court in finding fraud. Reaves v. Commissioner, 5th Cir. 1961, 295 F. 2d 336; Cefalu v. Commissioner, supra; Bryan v. Commissioner, supra. In this case, as in Merritt, there are other "badges of fraud." The partnership books and records were incomplete and inaccurate. The partners did not supply their bookkeepers with all the necessary data for maintaining complete and accurate records. The patently false assertion of a $35,000 beginning cash hoard is further evidence of the partners' fraudulent intent to underpay their taxes. Petitioners argue that Jake, Sr., had little activity in *166 the partnership other than that involved with the Party Store sales and purchases, and that John was concerned primarily with construction and maintenance for the partnership. Thus they claim that since the accounting for the gambling and other business receipts was primarily the responsibility of Andrew Jake, the other two partners were not responsible for the underpayment of taxes during these years and, hence, are not liable for the fraud penalty. The facts are that each of the partners devoted their full time to the partnership activities; and everything that was earned by any one of them in connection with the partnership operations belonged equally to all three. It is plain from the record that certain duties and activities in connection with the partnership operation were assigned to each of the three partners. But it was an equal partnership and each had equal responsibilities for the entire partnership operation. The record is clear that the partnership was a close family partnership, and what one knew, they all knew. John was the daytime operator of the bar, lounge and restaurant and also handled the outside construction activities. The father, Jake, Sr., was in charge of *167 the Party Store sales and purchases. Jake, Sr., also handled the Party Store receipts and turned the amounts over to the bookkeeper. Andrew Jake came in and took over in relief of John during the nighttime operation. The record is also clear that each knew of the 941 inadequate books being maintained by the partnership. We conclude on this record that the partners' actions were part and parcel of a conscious and deliberate attempt to evade the payment of their income tax liabilities for each of the years 1955 through 1959. Accordingly, we hold that respondent has met his burden of proving fraud by clear and convincing evidence. Issue 5 - Statute of Limitations Having determined that a part of the underpayment of tax in each of the years 1955 and 1956 was due to fraud with intent to evade tax, it follows that the assessment of deficiencies for those years is not barred by the statute of limitations. See section 6501(c)(1) of the Code. Deficiencies for the years 1957, 1958 and 1959 are open for assessment by consents. sessment by consents. Issue 6 - Claimed Partnership Net Operating Loss Carryover Petitioners have the burden of proving erroneous the respondent's disallowance *168 of their claimed deductions in 1955 for a claimed partnership net operating loss carryover for the year 1954. The evidence is meager. We have only the 1954 income tax return of Jake and Mary Mladinich which shows a partnership loss of $15,126.56 for 1954 on the operations of the Fiesta Sand Bar. Jake and Mary deducted in 1954 their share ($5,042.19) of the loss against their retal income of $8,580.94 and dividend income of $327.50 in arriving at adjusted gross income of $3,866.25. We do not know whether the other partners did the same thing. In any event, a partner's distributive share of a partnership loss is allowed only to the extent of the adjusted basis of such partner's interest in the partnership at the end of the partnership year in which such loss occurred. See sections 704(d) and 705 of the Code. We have no evidence establishing the basis of each partner's interest. Petitioners have failed in their burden of proof on this issue. To reflect the conclusions reached herein. Decisions will be entered under Rule 50. Footnotes
1. Consolidated herewith are the following cases: Andrew Jake Mladinich and June Mladinich, Docket No. 3152-63; Estate of Jake Mladinich, Sr., Deceased, Mary Mladinich, Administratrix and Mary Mladinich, Docket No. 3153-63; and John M. Mladinich and Virginia Mladinich, Docket No. 3409-63.↩
2. All statutory references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
*. Includes Hot Stop Restaurant inventory of $268.95.↩
*. Includes Hot Stop Restaurant equipment of $4,892.38.↩
*. Includes Hot Stop Restaurant building with cost basis of $13,646.57.↩
*. Includes increase of $7,795.15 as part of the items forming the basis for the increased deficiencies alleged in respondent's amendments to answers in Docket Nos. 3151-63 and 3409-63. ↩
**. Includes increase of $3,995.15 as part of the items forming the basis for the increased deficiencies alleged in respondent's amendments to answers filed in Docket Nos. 3151-63 and 3409-63.↩
*. Includes a $5,000 increase as part of the items forming the basis of the increased deficiencies as alleged in respondent's amendments to answers filed in Docket Nos. 3151-63 and 3409-63.↩
3. In the refund suit the United States District Court found that the books and records of the Mladinich partnership were inadequate and incomplete, and that the Commissioner properly used the net worth method.↩
4. In the refund suit the United States District Court concluded that amounts of cash withdrawn by the partners from time to time and that the $2,500 amount was correctly applied. As to John Mladinich the amount was conceded for purposes of the refund suit.↩
5. In the refund suit the United States District Court rejected a similar argument regarding the Hot Stop assets.↩
6. In the refund suit the United States District Court found the partners' assertions relating to the claimed $35,000 cash hoard to be "patently false."↩
7. We have several doubts concerning the applicability of collateral estoppel under these particular circumstances. First, we are cognizant of the admonitions that collateral estoppel be used cautiously "so as to avoid injustice." Commissioner v. Sunnen, supra at 599; James Couzens, 11 B.T.A. 1040 (1928). Second, there is a serious question as to whether the "privity" label can be applied to "partners" who were nonparties to the first suit and who did not control or openly participate therein to the extent that they have had their day in court. See William A. Belcher, Jr., 24 T.C.M. 1, 13 (1965); Campbell v. Bateman, 239 F. 2d 283 (C.A. 5, 1956); Alexander v. Commissioner, 224 F. 2d 788 (C.A. 5, 1955); Dillard v. McKnight, 34 Cal. 2d 209, 209 F. 2d 387 (Sup. Ct. Cal. 1949). Third, the facts as to the years before and after 1956 (the only year involved in the refund suit) are not "static," i.e., the "very same facts and no others." Commissioner v. Sunnen, supra at 601↩.